# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

UNITED STATES OF AMERICA        CRIMINAL NO. 07-CR-60054

VS.                             JUDGE DOHERTY

KEVIN FORREST                   MAGISTRATE JUDGE HANNA

## REPORT AND RECOMMENDATION

Before the undersigned is a Motion Seeking Release from Custody (Rec. Doc. 47),

filed by defendant Kevin Forrest.  The motion is opposed by the government.  An

evidentiary hearing was held on October 1, 2010.  At the hearing, Glenn W. Ahava,

Ph.D., forensic psychologist and the court's appointed expert, testified.  Testifying by

video conference were Dr. Bruce R. Berger, M.D., staff psychiatrist at the Federal

Medical Center at Butner, North Carolina, Edward Landis, Ph.D., deputy chief

psychologist and Dr. Jean P. Zula, M.D., chief psychiatrist at Butner.  Defendant was

present and represented by counsel.

### Background and Argument

The defendant was charged by indictment with violations of 21 U.S.C §846 and

§841(a)(1), Conspiracy to Possess with Intent to Distribute Cocaine Base (Crack) and

Cocaine (Powder) and Possession with Intent to Distribute Cocaine (Powder).  He was

arraigned on January 15, 2008 and was ordered detained pending trial pursuant to 18

U.S.C. §3142(f) on the factual basis that he was a danger to the community and a flight

1

risk (Rec. Doc. 14).  At the time, Magistrate Judge Hill noted the defendant was in the custody of the State of Texas and was unable to make his bond, therefore, he was ineligible for release (Rec. Doc. 14). He further noted that the defendant was charged with a drug trafficking crime, the maximum penalty for which was 10 years or more (Rec. Doc. 14).

On December 4, 2008, the Court noted in a status conference that the defendant had been previously indicted on similar charges in 00-CR-60009-03 (Rec. Doc. 32). In that prior case, the defendant was charged with one count of violating 21 U.S.C. §846, Conspiracy to Distribute Cocaine Base (Crack), and three counts of violating 21 U.S.C. §841(a)(1), Possession with intent to Distribute Cocaine Base (Crack). A full competency evaluation was conducted and the defendant was found to be mentally incompetent to stand trial. The report issued at that time by Dr. Thomas McCormack, Dr. Bruce Berger and Jill Grant, Ph. D. from the facility in Butner, North Carolina stated "Forrest remains mentally incompetent to stand trial due to mental retardation and psychosis, [and]..it is unlikely he will ever be restored to competency." A motion to release was filed which was granted on February 3, 2004; however, the release was granted on conditions which expired on July 9, 2004 (Rec. Doc. 570, 576 in 00-CR-6009-03). On May 20, 2005, the indictment was dismissed without prejudice (Rec. Doc. 595 in 00-CR-6009-03).

In the instant case, on January 19, 2009, the defendant filed an unopposed motion for determination of defendant's mental competency to stand trial as well as his

competency at the time the offenses were allegedly committed (Rec. Doc. 33). The court

granted the motion and ordered a psychiatric examination pursuant to 18 U.S.C. §4241

and §4242 (Rec. Doc. 35).  On June 16, 2009, former Magistrate Judge Mildred Methvin

noted that defendant underwent a psychological evaluation at the Federal Correctional

Institute in Forth Worth, Texas, between March 5 and April 17, 2009.  The evaluator,

Robert Johnson, Ph.D., in his Psychological Evaluation, after administering multiple

psychometric tests, conducting clinical and collateral interviews and reviewing past

records, concluded that the defendant was mentally incompetent to stand trial, stating as

follows:

> Due to the opinion Mr. Forrest is currently incompetent, it is recommended
> he be transferred to a Federal Medical Center for psychiatric stabilization,
> as well as, an attempt at competency restoration.[1]

In his report, Dr. Johnson noted "The discrepancy in his cognitive testing, brain

scans and his self-reported behavioral capabilities in the aforementioned alleged criminal

enterprise, suggest malingering should be ruled out as a diagnosis."[2]  On Axes I and II of

the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*

(DSM-IV-TR), Dr. Johnson diagnosed Forrest with the following:

Axis I:     Rule Out Malingering, V65.2
            Adult Antisocial Behavior, V71.01
            Generalized Anxiety Disorder, 300.02

---

[1]Psychological Evaluation by Robert Johnson, Ph.D. (Rec. Doc. 37)(Sealed
Report), p. 29.

[2]Id., p. 16.

3

Alcohol Dependence, 303.90
Sedative, Hypnotic, or Anxiolytic Dependence, 304.10
Rule Out Psychotic Disorder Not Otherwise Specified, 298.9
Rule Out Cognitive Disorder Not Otherwise Specified, 294.9

Axis II:        Borderline Intellectual Functioning, V62.89[3]

Following Dr. Johnson's evaluation and report, the government and defense

waived a formal competency hearing and agreed that the defendant should be committed

to the custody of the Attorney General for hospitalization pursuant to 18 U.S.C. §4241(d)

to determine if his competency could be restored (Rec. Doc. 38).  As a result,  Magistrate

Judge Methvin issued an Order of Commitment for Hospitalization and Evaluation, which

stated in pertinent part as follows:

> IT IS HEREBY ORDERED that Forrest be committed to the custody of the United
> States Attorney General for hospitalization and treatment pursuant to § 4241(d)(1)
> in order to determine whether there is a substantial probability that in the
> foreseeable future he will attain the capacity to permit the trial to proceed.
> IT IS FURTHER ORDERED that Forrest shall be committed to the facility for no
> more than four months from the date of his arrival pursuant to § 4241(d)(1).
> IT IS FURTHER ORDERED that the federal medical facility shall comply with
> the provisions of 18 U.S.C. § 4241(e) in the event Forrest has recovered to the
> extent that he is able to understand the nature and consequences of the proceedings
> against him and to assist properly in his defense, and the director shall promptly
> file a certificate to that effect with the Clerk of Court.
> IT IS FURTHER ORDERED that if, after evaluation, Forrest's mental condition
> has not improved as to permit the trial to proceed, the director of the facility in
> which Forrest is hospitalized shall submit a psychiatric and/or psychological report
> pursuant to 18 U.S.C.§§4241(b), 4246(b) and 4247(b) and (c) which shall include:
> (1) the defendant's history and present symptoms;
> (2) a description of the psychiatric, psychological and medical tests

---

[3]Psychological Evaluation by Robert Johnson, Ph.D. (Rec. Doc. 37)(Sealed
Report), p. 23, 24.

4

that were employed and their results;
(3) the examiner's findings;
(4) the examiner's opinions as to diagnosis, prognosis, and whether
defendant is suffering from a mental disease or defect rendering
him mentally incompetent to the extent that he is unable to
understand the nature and consequences of the proceedings against
him or to assist properly in his defense;
(5) whether defendant was insane at the time of the offense charged;
and,
(6) whether defendant poses a substantial risk of bodily injury to
another person or serious damage to property of another. . . .
(Rec. Doc. 39)

Following hospitalization at the Federal Medical Center at Butner, North Carolina,

a Forensic Evaluation was issued by Dr. Bruce Berger and Jill Grant, Ph.D. on May 10,

2010, in which it was concluded that, following the period of restorative treatment, the

defendant remained incompetent to stand trial and there was not a substantial probability

that he would regain competency in the foreseeable future (Rec. Doc. 46).[4]  In their

report, Drs. Berger and Grant stated they reviewed their previous evaluation of Mr.

Forrest, dated December 12, 2001; the psychological evaluation by Dr. Johnson dated

April 23, 2009; the Federal Bureau of Prisons Psychological Data System Records; the

court orders; and educational and medical records sent by counsel for Mr. Forrest.   In

their report, Drs. Berger and Grant stated as follows:

During this evaluation Mr. Forrest was seen individually by Bruce R.
Berger, M.D., Staff Psychiatrist with psychological consultation provided
by Jill Grant, Psy.D., Staff Psychologist.  Other members of the Forensic

_____

[4]Forensic Evaluation by Dr. Bruce R. Berger, M.D. and Jill Grant, Ph.D. (Rec.
Doc. 46-1)(Sealed), p. 6.

Team, Correctional and Mental Health Staff had the opportunity to observe
Mr. Forrest's behavior throughout the course of the evaluation period.
Their comments were considered prior to the preparation of this report.  The
following assessment procedures were utilized as part of the evaluation
process.

Clinical Interviews (Ongoing)
Behavioral Observations (Ongoing)
Physical Examination (12/23/09)
Risk Panel (04/26/10)[5]

The report also noted that Forrest did not participate in the competency restoration

program:

Mr. Forrest was referred to an educational competency restoration group
upon his admission.  This is an educational group format that meets
generally on a weekly basis to go over general issues of competency.  In
spite of multiple reminders and being placed on call out Mr. Forrest did not
attend the group and generally reported "I forgot."  When counseled about
this issue as well as other issues such as getting up during the day time to
interact more with others and attempt to stay awake so he would sleep better
at night, he would be polite and agree, but not follow through.[6]

Regarding the issue of malingering, Drs. Berger and Grant reported as follows:

His most recent evaluation performed by Dr. Johnson notes a Rule Out
diagnosis of Malingering.  Specific to Mr. Forrest's case is the concern to
what degree, if any, is Mr. Forrest exaggerating his underlying real mental
health deficits.[7]

Drs. Berger and Grant discussed the inadequate level of improvement in Forrest's

---

[5]Id., p. 2.

[6]Id., p. 4.

[7]Forensic Evaluation by Dr. Bruce R. Berger, M.D. and Jill Grant, Ph.D. (Rec.
Doc. 46-1)(Sealed), pgs. 5, 6.

6

psychiatric symptoms, despite multiple psychotropic interventions and medication compliance and noted that "Although it is possible that his lack of motivation to improve or apply himself to learning tasks may be volitional, apathy and the ability to self-motivate can also be significant symptoms of a psychotic or cognitive disorder."[8]

Drs. Berger and Grant concluded that was the case, stating as follows:

Based in part on the above, it is our opinion that Mr. Forrest does suffer from a mental disease or defect and he is not currently competent to proceed to trial, nor is there a substantial probability that he will regain this capacity in the foreseeable future.[9]

A formal risk panel of the medical staff at Butner was convened who concluded the defendant did not pose a substantial risk of bodily injury to another person or serious damage to the property of another and recommended the defendant's "unconditional release."[10]

After conference with the Court, the defendant filed the present motion for release under 18 U.S.C. §4246(e).  Due to the complexity of the matter and the fact that no formal competency hearing had been held, as well as concerns regarding the reliability of the opinions of the Butner evaluators both as to competency and risk, considering defendant did not participate in the competency restoration program and his criminal history, the court appointed Glenn W. Ahava, Ph.D., forensic psychologist, as the court's

---

[8]Id., p. 6.

[9]Id., p. 6.

[10]Id., p. 7.

expert pursuant to Federal Rule of Evidence Rule 706  to evaluate the defendant and

provide a report in accordance with 18 U.S.C. §4247(b) and (c)(Rec. Doc. 51).   The

matter was set for evidentiary hearing pursuant to 18 U.S.C. §4241(d), §4246(e) and/or

§4247(h)(Rec. Doc. 53).

Prior to the hearing, Dr. Ahava issued a Psychological Evaluation, which was

distributed by the court to counsel for the defendant and the government.[11]   Dr. Ahava

reported he had reviewed the prior evaluations of Forrest back to 1993, and had also

found in defendant's records a Weschsler Intelligence Scale for Children - Revised test

administered to defendant when he was 13 years old, in 1985.  Dr. Ahava reported

Forrest's IQ on this test was 98, or 45th percentile, suggesting that his IQ was average.[12]

Dr. Ahava concluded regarding any diagnosis of mental retardation:

> Therefore, Mr. Forrest does not meet the diagnostic criteria for Mental
> Retardation.  In fact, his highest Full Scale IQ score of 98 is approximate 30
> points higher than that is required for even the most mild of mental
> retardation diagnoses.[13]

Dr. Ahava also specifically addressed malingering.  As reported by Dr. Ahava,

according to the DSM-IV-TR:

> The essential feature of malingering is the intentional production of false or
> grossly exaggerated physical or psychological symptoms, motivated by an

---

[11]Psychological Evaluation by Glenn W. Ahava, Ph.D.  (Rec. Doc. 58)(Sealed
Report).

[12]Id., p. 5.

[13] d., p. 14.

8

external incentive, such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs.[14]

As Dr. Ahava further explained, the presence of a mental disorder does not negate a finding of malingering, or vice versa:

> One common error is assessing criminal defendants for malingering is to inquire whether they are genuinely suffering from a mental disease or defect *or* are they faking signs and symptoms of a condition to avoid or abate the severity of criminal sanctions.  This conception is misleading.  *It is possible, if not common, for defendants who have a genuine mental disease or defect to exaggerate their condition or manufacture another condition so as to avoid consequences of their criminal behavior.*[15]

Dr. Ahava evaluated tests previously given and administered tests of his own to assess whether Forrest was malingering.  Dr. Ahava noted "When the Bureau of Prisons administered the MMPI-2, the results were invalid due to Mr. Forrest's, 'extreme over-reporting of symptoms."[16]  Dr. Ahava also reviewed  the Bureau of Prison's *Validity Indicator Profile* results, which Dr. Ahava noted was "appropriate for individuals with mild cognitive impairment. . . ."[17]  Dr. Ahava noted the BOP staff reported the following:

> Results on this measure were likely not a true representation of Mr. Forrest's ability due to either not be [sic] fully engaged in the task or having such poor reasoning ability that the test could not validly assess his ability,

---

[14]Psychological Evaluation by Glenn W. Ahava, Ph.D.  (Rec. Doc. 58)(Sealed Report), p. 14.

[15]Psychological Evaluation by Glenn W. Ahava, Ph.D.  (Rec. Doc. 58)(Sealed Report), p. 14.

[16] d.

[17]Id.

as is the case with significant mental retardation.[18]

Dr. Ahava noted, however, that Forrest did not have mental retardation and that "He produced an invalid profile on a measure even those with mild cognitive impairment can adequately complete."[19]

Dr. Ahava administered his own test designed to detect malingering, a forced choice test using cards.  Dr. Ahava reported "he would have done just as well by random guessing" and "[t]his type of pattern is highly suggestive of malingering."[20]  Dr. Ahava also administered the *Inventory of Legal Knowledge* (ILK), designed in part to "'detect feigned deficits in legal knowledge.'"[21]  Dr. Ahava reported the results as follows:

> Mr. Forrest yielded a total score of 36 on the ILK, which is just barely above what one would obtain with random responding.  More importantly, he scored worse than 99% of those in the "normal" community sample and worse than 92% of those who were in a psychiatric hospital and were instructed to answer the questions honestly.

> Mr. Forrest may have overplayed his hand.  His score on the ILK is also worse than 90% of defendants whom the courts have adjudicated incompetent.  But, his score is on par with almost 9 out of 10 subjects who were trying to feign being incompetent.  In fact, his score is average for insanity acquittees (NGRI) who were instructed to "fake bad" for competence on this measure.  That is, Mr. Forrest's performance on the ILK

---

[18]Psychological Evaluation by Glenn W. Ahava, Ph.D.  (Rec. Doc. 58)(Sealed Report), p. 14.

[19]Id.

[20]Id., p. 15.

[21]Psychological Evaluation by Glenn W. Ahava, Ph.D.  (Rec. Doc. 58)(Sealed Report), p. 15.

parallels those who are responding dishonestly, and exaggerates to poor performance of even those who are actually incompetent.[22]

Dr. Ahava concluded regarding malingering:

Therefore, it is my opinion, within a reasonable degree of professional certainty, that Mr. Forrest has been feigning cognitive impairment for the purpose of avoiding criminal prosecution or mitigating sentencing and other consequences in the present matter.[23]

Dr. Ahava reported he also attempted to administer the *Evaluation of Competency to Stand Trial - Revised* (ECST-R), which is a test to evaluate "psycholegal domains relevant to the legal standard for competency set in Dusky;" however, Dr. Ahava reported:

Mr. Forrest frankly failed to comply with the administration of this measure.  He provided one-word replies to queries that demanded sentences in response.  He feigned to lack knowledge to questions he had previously answered correctly.  Therefore, the administration was aborted.[24]

Dr. Ahava's report detailed his questions to Forrest designed to determine his awareness of the nature of the proceedings and to assist in his own defense, as outlined in State v. Bennett, 345 So.2d 129 (La. 1977), as well as his understanding of compulsory process.  Dr. Ahava used this method of inquiry because "Mr. Forrest would not reliably

---

[22]Id., pgs. 15, 16.

[23]Id., p. 22.

[24]Psychological Evaluation by Glenn W. Ahava, Ph.D.  (Rec. Doc. 58)(Sealed Report), p. 16.

and validly complete a structured measure of competence. . . ."[25]  Dr. Ahava reported Mr.

Forrest had a factual understanding and rational understanding of the criminal

proceedings; was able to consult with his lawyer; and able to assist his attorney in

preparing his defense.  Dr. Ahava concluded regarding competency:

> It is my opinion, within a reasonable degree of professional certainty, that
> Mr. Forrest is more likely than not able to meet all four elements of
> competency as outlined above.  This applies to both competency to stand
> trial as well as competency to enter a plea.[26]

Regarding whether Mr. Forrest is suffering from a mental disease or defect as a

result of which his release would create a substantial risk of bodily injury to another

person or serious damage to property of another, if he were found incompetent and

released back into the community, Dr. Ahava stated the question was whether drug

dealing constituted dangerousness, as Mr. Forrest has a "very high risk of returning to a

lifestyle which involves using and distributing illegal drugs."[27]  Dr. Ahava opined that

Mr. Forrest and his drug associates likely use weapons to protect themselves, their money

and their drugs, and that Mr. Forrest admitted selling drugs to children as well as adults.

Dr. Ahava concluded regarding dangerousness as follows:

Considering the actual and potential devastation to individuals and families

---

[25]Id.

[26]Id., p. 20.

[27]Psychological Evaluation by Glenn W. Ahava, Ph.D.  (Rec. Doc. 58)(Sealed
Report), p. 24.

through the use of cocaine and the other drugs in which Mr. Forrest admitted trafficking, it is my opinion, within a reasonable degree of professional certainty, that were he to be released into the community, he would resume his drug business and that this would constitute a substantial risk of bodily injury to another person.[28]

At the evidentiary hearing, Dr. Berger testified he was part of Forrest's competency evaluation team in 2001, when he was initially found incompetent to stand trial, as well as at the present time. Dr. Berger testified that as a psychiatrist, he does not interpret or give psychological tests, but can only read the narrative results. Dr. Berger testified neither he nor his staff did any additional testing of Forrest from 2009 to 2010, as Dr. Grant, the psychologist at Butner, felt the testing performed by Dr. Johnson at Fort Worth was sufficient. Dr. Berger also testified Dr. Grant had very little contact with Forrest, and it was left primarily to him to do interviews with Forrest. Dr. Berger estimated he conducted between four and six interviews with Forrest, averaging anywhere from 20 minutes to a little over an hour.

Dr. Berger testified that Forrest had given a history of having been in an automobile accident as a child, and having a metal plate in his head.[29] However, imaging studies in 2001 and 2002 showed there were no metal plates. Therefore, Forrest was noted historically as having had a traumatic injury. Dr. Berger also testified that he did

---

[28]Id., p. 24.

[29]In the Psychological Evaluation by Dr. Johnson, it was reported that Forrest stated he had been in an automobile accident when he was three years old. Psychological Evaluation by Robert Johnson, Ph.D. (Rec. Doc. 37)(Sealed Report), p. 5.

not recall remembering or seeing information that, at age 13, Forrest had an IQ well above that required for a diagnosis of mental retardation.  Dr. Berger testified that while he considered whether Forrest was malingering he felt, from his and his staff's observations and Forrest's history and previous testing, that Forrest's poor performance was likely due to mental retardation and he did not feel comfortable making a diagnosis of malingering.

When queried about Forrest's responses to the questioning by Dr. Ahava regarding the nature of proceedings,  Dr. Berger testified Forrest's responses Dr. Ahava were much more specific, clearer, and better organized.   Dr. Berger testified, in a nutshell, that if Forrest would have responded to him as he did to Dr. Ahava to the questions relevant to competency, it would have had an effect on his assessment of Forrest's competency to stand trial.

Dr. Berger testified that when Forrest was at Butner in 2001, he avoided the educational classes designed to restore competency, and when Forrest was at Butner this time, he again refused to attend competency education classes.

Dr. Berger testified his diagnosis of Psychotic Disorder, Not Otherwise Specified was made primarily by Forrest's self-report and historical records.  Dr. Berger agreed that that it would seem to mitigate towards a finding of competency if:  1)  testing was done specifically for the purpose of verifying whether the information Forrest provided to his evaluators was accurate or misleading and that testing showed there was an intent to

14

deceive; 2) if the self reported psychotic symptoms were inaccurate; and, 3) if Forrest was capable of answering questions in a manner that indicates he understands the charges, the system, and the consequences.  However, Dr. Berger stated he would have to review the details of such findings.

Dr. Jean Zula, a member of the risk panel, testified at the hearing also.  She stated their decision that Forrest, if released as incompetent, would not create a substantial risk of bodily injury to another person or serious damage to the property of another was based on a presentation by Dr. Berger including background information, his findings, the previous findings of others, his arrest records, and an interview with Forrest.  Dr. Zula clarified that the finding of the risk panel was based on an interpretation of the statute that requires the substantial risk occur as a result of mental illness and not as a result of other factors such as adult antisocial behavior, i.e. criminal behavior.

Dr. Landis, a psychologist and member of the risk panel, testified and was asked by the Court a question similar to the one posed to Dr. Berger –  that is, if the Axis I diagnosis of Psychotic Disorder NOS is disproved or Forrest has recovered, the information provided historically and factually is shown to be inaccurate, and considering Forrest's refusal to cooperate in the competency restoration process, is there a basis to say his competency cannot be restored even if he was incompetent at one time?  Dr. Landis responded that if these factors were established, the implication would be there would not be a basis to conclude he could not be restored to competency.

15

Glenn W. Ahava, Ph.D., a forensic psychologist appointed by the Court, also testified at the evidentiary hearing.  Dr. Ahava stated that since Forrest had refused to participate in the competency restoration group at Butner, Dr. Ahava had some education in the course of the evaluation and later questioned him on those issues to gauge his understanding.  Dr. Ahava stated he clearly understood the conspiracy charges against him once they were explained to him; that is, it was not necessary that he actually have physically possessed the cocaine to be charged with conspiracy.  Dr. Ahava testified Forrest had a very clear understanding of the amount of cocaine, how to buy it, who was in the car with him, and who was buying from whom.  He understood the possible penalties, the difference between guilt and innocence, the consequences of a plea, and his legal rights to remain silent, to have an attorney, and to have the court appoint an attorney if he could not afford one.  He understood probation and fines, and had a basic understanding of courtroom personnel and their roles.  Dr. Ahava stated Forrest did not seem to understand compulsory process, or the right to appeal.  However, when asked by the Court if fully explained, did Forrest have the mental faculties to understand compulsory process, the right to appeal, court personnel and their roles, Dr. Ahava responded "without question" and "yes."  Dr. Ahava also testified that while Forrest is somewhat upset with his lawyer for not getting him out of jail sooner, he felt Forrest was able to assist him with his defense, as his recall of events was crystal-clear, his courtroom conduct was appropriate, and he could testify in his own defense adequately if he chose to

16

do so.

Dr. Ahava testified Forrest's mental condition was likely to deteriorate only if he starting using drugs again, and while it was uncertain whether he really needed the medication he was prescribed for his diagnosed psychotic disorder, withdrawing from the medications could be destabilizing.  Therefore, while the decision was up to Forrest's medical doctors, he felt it would be advantageous to maintain Forrest on his medications through any hearings.

Dr. Ahava was asked by Court if there was such a thing as adult onset mental retardation, to which Dr. Ahava responded there was not.  Dr. Ahava stated there was no evidence Forrest was mentally retarded before the age of 18, and the evidence in the record is that he was not based on the IQ scores when he was 13 years old.

Dr. Ahava also testified, when queried by the Court, that Forrest's diagnosis of Psychotic Disorder NOS was primarily based on Forrest's self-reported information and that if the self-reported information was inaccurate, which appeared likely, the diagnosis failed on its own.

When Dr. Ahava was queried, he agreed that based on the information he had before him and the testimony of the evaluators from Butner, nothing was done during the competency restoration period to actually rule out malingering as suggested by Dr. Johnson's report and his Axis I diagnosis of Rule Out Malingering.

Additionally, Dr. Ahava clarified that competency is "present day" and one can be

competent at one point in time and not at another.  However, Dr. Ahava testified, at no time during his evaluation of Forrest did he see anything that would imply Forrest was incompetent at the time of the hearing.

Dr. Ahava summarized that based on the competency criteria of Dusky and Drope, he did not see any significant obstacles to competency from a forensic psychological standpoint.

On cross-examination, Dr. Ahava explained why his opinion differed from other evaluators.  He explained first, that competency was a present state of mind, and while Forrest may have been incompetent at the time of one or more of the prior evaluations, at the time Dr. Ahava evaluated him and at the time of the hearing, Forrest was competent. Dr. Ahava also testified there is a "woozle effect"[30] at work in labeling people – that is, a confirmatory bias where people get tunnel vision and are not willing to reconsider the facts.  He was simply a pair of fresh eyes, he explained.  Moreover, Dr. Ahava testified, approximately one-half of the evaluators were psychiatrists, who do not do or understand psychological testing, and without the ability to discern with science whether an individual is telling the truth or not they are no better if not worse than discerning truth-telling than any other individual.

When asked by counsel for the government, Dr. Ahava testified Forrest did not rock, shuffle his feet or his body, appear to hear any voices, or get distracted during his

---

[30]See A.A. Milne, The Complete Tales of Winnie-the-Pooh (1926).

interviews as he did during the hearing.

*Applicable Law and Discussion*

**<u>Legal Standard for Competency</u>**

A criminal defendant may not be tried unless he is competent.  <u>Pate v. Robinson</u>,

383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). ". . . [t]he criminal trial of an

incompetent defendant violates due process." <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 354,

116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996), citing <u>Medina v. California</u>, 505 U.S. 437,

453, 112 S.Ct. 2572, 2581, 120 L.Ed.2d 353 (1992); <u>Drope v. Missouri</u>, 420 U.S. 162,

171-172, 95 S.Ct. 896, 903- 904, 43 L.Ed.2d 103 (1975); <u>Pate v. Robinson</u>, 383 U.S. 375,

378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966).  Justice Kennedy, in <u>Drope</u>, described the

fundamental nature of the right as follows:

> Competence to stand trial is rudimentary, for upon it depends the main part
> of those rights deemed essential to a fair trial, including the right to
> effective assistance of counsel, the rights to summon, to confront, and to
> cross-examine witnesses, and the right to testify on one's own behalf or to
> remain silent without penalty for doing so.

<u>Cooper v. Oklahoma</u>, 517 U.S. 348, 354, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498

(1996), citing <u>Riggins v. Nevada</u>, 504 U.S. 127, 139-140, 112 S.Ct. 1810, 1817-1818, 118

L.Ed.2d 479 (1992)(opinion concurring in judgment)(*citing* <u>Drope v. Missouri</u>, 420 U.S.

162, 171-172, 95 S.Ct. 896, 903-904, 43 L.Ed.2d 103 (1975)).

The test for incompetence is also well-settled.  "It is not enough for the district

judge to find that 'the defendant (is) oriented to time and place and (has) some

19

recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'"  Dusky v. U.S., 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curiam)(quoting from the Solicitor General's brief).  Drope added an additional element to the test of competency by requiring that the defendant be able "to assist in preparing his defense."  Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 903 (1975).  Thus, to be competent, a defendant must:

1.    be able to consult with the lawyer with a reasonable degree of rational understanding;
2.    be able to otherwise assist in the defense;
3.    have a rational understanding of the criminal proceedings; and
4.    have a factual understanding of the proceedings.[31]

While 18 U.S.C. §4241 is silent regarding the burden of proof, the Fifth Circuit has held that the government bears the burden of proof in federal prosecutions of proving the defendant's competence to stand trial by a preponderance of the evidence.  See Lowenfield v. Phelps, 817 F.2d 285, 294 (5th Cir. 1987); United States v. Makris, 535 F.2d 899, 906 (5th Cir. 1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803.

*Special Issues Relating to Mental Retardation*

-----

[31] *See also* Mental Health Standard 7.4(b),  ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS (1984) (hereinafter "Mental Health Standards").  The American Bar Association developed this set of standards for evaluating competence issues, based upon the holdings of Dusky and Drope .

Mental retardation may render an individual incompetent to stand trial.[32]  In

evaluating competence, the court should take into consideration the key differences

between mentally ill and mentally retarded criminal defendants:

> Separate techniques and measures have been developed for defendants with
> mental retardation.  The prime reason for the division is due to significant
> differences between the two populations.  While incompetency due to
> mental illness may be very different over time and may be reversible with
> treatment, incompetency due to mental retardation is more static and relates
> more directly to susceptibility to suggestion.[33]

Courts should specifically guard against the arbitrary use of general competency

assessment techniques and standards in assessing a mentally retarded defendant's

competency:

> [T]he existence of a specialized competency scale for assessing persons
> with mental retardation does not mean that there are no other customary and
> accepted methods of assessment.  There is a general recognition that
> competence is based on a specific set of cognitive abilities and the
> functional capacity to exercise those abilities.  Thus, competency scales or
> structured interviews can be used with persons who have mental
> retardation.  However, because persons with mental retardation are
> cognitively impaired, not mentally ill, the strongly cognitive elements of a
> competency evaluation need to be given special attention.  In addition,

---

[32] Mental Health Standard 7-4.1(c) provides:

A finding of mental incompetence to stand trial may arise from mental
illness, physical illness, or disability; mental retardation or other
developmental disability; or other etiology so long as it results in a
defendant's inability to consult with defense counsel or to understand the
proceedings.

[33]National Benchbook on Psychiatric and Psychological Evidence and Testimony,
Chapter 7 at 168 (ABA Commission on Mental and Physical Disability Law, Sept. 1998)
(hereinafter "National Benchbook").

defendants with mental retardation may be limited as to their functional behavior.  Thus, a defendant with mental retardation might be seemingly "restored" to competency by instructing that individual about trial elements, but he or she may not be able to make intelligent legal decisions.[34]

In <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Court incorporated the definition of mental retardation outlined by the American Psychiatric Association ("APA") and contained in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition Text Revision ("DSM-IV-TR") and the definition set forth by the American Association for the Mentally Retarded ("AAMR").

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows:  "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."

See <u>Atkins v. Virginia</u>, 536 U.S. at 308, FN. 3, citing Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation

---

[34]National Benchbook, Chapter 7 at 169 (emphasis supplied).

has many different etiologies and may be seen as a final common pathway
of various pathological processes that affect the functioning of the central
nervous system.". . . "Mild" mental retardation is typically used to describe
people with an IQ level of 50-55 to approximately 70.
Atkins v. Virginia, 536 U.S. at 308, FN. 3, citing Diagnostic and Statistical Manual of
Mental Disorders 41 - 43 (4th ed.2000).

In U.S. v. Nelson, 419 F.Supp.2d 891, 894 -895 (E.D.La. 2006) the court found the

two definitions to be essentially congruent.

*Insanity at the Time of the Offense*

The issue of insanity at the time of the offense is governed by 18 U.S.C. § 4242,

which requires (1) a Rule 12.2 notice by the defendant that he intends to rely on the

defense of insanity; and (2) a motion by the government for a psychological examination.

Congress specifically defined insanity as "unable to appreciate" the wrongfulness of

actions. 18 U.S.C. §17.  Neither requirement is met here, and therefore, this issue does not

need to be addressed at this point.  Further, 18 U.S.C. §4241(f) provides, "A finding by

the court that the defendant is mentally competent to stand trial shall not prejudice the

defendant in raising the issue of his insanity as a defense to the offense charged. . . ."

Therefore, defendant may still plead insanity regardless of the result of the competency

determination.

***Discussion***

Dr. Johnson's evaluation and report is the first immediately relevant to Forrest's

current competency, which the experts have testified is a static concept, and the current

charges.  In Dr. Johnson's report, he clearly lists Rule Out Malingering as an Axis I

diagnosis on the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* (DSM-IV-TR).  Dr. Johnson's report stated multiple times there were inconsistencies between the results of neuropsychological testing and Forrest's adaptive abilities in the community and brain scans, and malingering should be addressed as a cause of these discrepancies.  Dr. Johnson's report also diagnosed Rule Out Psychotic Disorder Not Otherwise Specified, Rule Out Cognitive Disorder Not Otherwise Specified, Alcohol Dependence, and Sedative, Hypnotic, or Anxiolytic Dependence.

There was no effort made to rule out malingering at Butner by any testing or other scientific means during the competency restoration period.  As Dr. Berger testified, he and his staff simply reviewed his prior history, observed him for a period of four months, and interviewed him approximately five times.  For these reasons, the undersigned finds the opinions of the evaluators at Butner regarding Forrest's competency to stand trial are not reliable under Federal Rule of Evidence 702, and do not satisfy the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

On the other hand, Dr. Ahava specifically addressed by psychological testing, as well as interviews and review of his history, whether Forrest was malingering and ruled malingering *in* as a diagnosis.   Dr. Ahava testified that Forrest's malingering skewed the results of all of Butner's findings regarding the presence of a Cognitive Disorder Not Otherwise Specified and Psychotic Disorder Not Otherwise Specified, as well as the

diagnosis on Axis II of Mild Mental Retardation, 317, as these findings were based on invalid test results and exaggerated or untruthful self-reporting.  First, the evaluators at Butner were apparently unaware that Forrest had tested with a normal IQ prior to age 18, and therefore could not be diagnosed as mentally retarded.  Moreover, to the extent Forrest does have some type of Cognitive Disorder, the undersigned finds, based on the testing by Dr. Ahava, that Forrest has grossly exaggerated any cognitive deficits he may have.  As discussed above, Forrest was able, in response to specific questions relevant to his awareness of the nature of the proceedings and ability to assist in his defense, to respond adequately.   Therefore, the undersigned finds any cognitive disorder actually possessed by Forrest does not render him incompetent.

Dr. Ahava testified that Forrest's exaggeration of self-reported symptoms and history of prior drug and alcohol use cast doubt on any diagnosis of Psychotic Disorder Not Otherwise Specified.  Dr. Johnson's evaluation diagnosed "Rule Out Psychotic Disorder Not Otherwise Specified."  Based on the testimony of Dr. Ahava, the undersigned finds Psychotic Disorder Not Otherwise Specified to be ruled out. Alternatively, any true psychotic disorder is controlled through prescribed medications and abstinence from drugs and alcohol.  Therefore, even if Forrest is suffering from any form or degree of psychotic disorder, which the evidence does not support, such disorder does not interfere with his competency.

Forrest has been incarcerated since his arrest either at a jail or confined in a

hospital setting.  Therefore, the undersigned finds Forrest is presently presumably free from drugs and alcohol, and any diagnoses of dependence on same do not presently render him incompetent.

### Conclusion and Recommendation

In conclusion, the undersigned finds the opinion of the Butner evaluators that Forrest is incompetent to stand trial is unreliable for the reasons given above.  Moreover, even if Dr. Johnson's opinion that Forrest was incompetent in April, 2009 was valid and reliable at that time, which is unlikely given Forrest's exaggerated reports and invalid test results, the undersigned finds subsequent testing and information developed by Dr. Ahava, as well as continued abstinence from drugs and alcohol and maintenance on prescribed medications has rendered Forrest presently competent to stand trial under the applicable legal standards and under 18 U.S.C. §4241(d), Mr. Forrest's mental condition is so improved that trial may proceed.  Therefore, for the reasons given above,

**IT IS THE RECOMMENDATION** of the undersigned that defendant's Motion Seeking Release from Custody (Rec. Doc. 47) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that Mr. Forrest be deemed competent under the applicable legal standards and this matter be set for trial.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and

recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Thus done and signed this 7th day of October 2010.

Patrick J. Hanna
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)